IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:10-CT-3121-FL

| | | |
|---|---|---|
| KAMAL PATEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| JACQUELINE MORIN,[1] JASON | ) | |
| TUCKER-HILL,[2] MR. BARRETT, MR. | ) | |
| ELWOOD, SHORTY BRAWNER, | ) | |
| CANDACE GREGORY, DR. | ) | |
| MERCADO, ART BEELER, MRS. | ) | |
| ADCOCKS, LYNNELL COX, and JEFF | ) | |
| TILLEY, | ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the court on motion for summary judgment (DE 68) pursuant to

Federal Rule of Civil Procedure 56 filed by defendants Mrs. Adcocks ("Adcocks"), Mr. Barrett

("Barrett"), Shorty Brawner ("Brawner"), Lynnell Cox ("Cox"), Candace Gregory ("Gregory"), Dr.

Mercado ("Mercado"), Jacqueline Morin ("Morin"), Jeff Tilley ("Tilley"), Jason Tucker-Hill

("Tucker-Hill") (collectively "defendants"). The issues raised are ripe for adjudication. For the

following reasons, the court grants defendants' motion for summary judgment.

---

[1] The party identified by plaintiff as Ms. Moron has informed the court that her actual name is Jaqueline Morin. The court will hereinafter use the correct name, and the Clerk of Court is DIRECTED to include the correct name in the court's caption.

[2] The party identified by plaintiff as Hee Haw Tucker-Hill has informed the court that his actual name is Jason Tucker-Hill. The court will hereinafter use the correct name, and the Clerk of Court is DIRECTED to include the correct name in the court's caption.

## STATEMENT OF THE CASE

The court has extensively detailed the procedural posture of this action in prior orders. For ease of reference, a pertinent portion of the statement of the case set forth in the court's September 25, 2012, order, is restated here:

> On July 6, 2010, plaintiff filed this action pursuant to <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971). On April 4, 2011, Adcocks, Barrett, [Art] Beeler ["Beeler"], Brawner, Cox, Gregory, [Harley] Lappin ["Lappin"], Mercado, Mor[in], Tilley, and Tucker-Hill filed a motion to dismiss pursuant to Rule 12(b)(6). Plaintiff then filed a motion to amend his complaint. On May 26, 2011, the court entered an order granting plaintiff's motion to amend, directing plaintiff to file his amended complaint, and denying as moot defendants' motion to dismiss.

> On June 10, 2011, plaintiff filed his amended complaint. Plaintiff's amended complaint seeks both monetary damages and injunctive relief. The court subsequently conducted a review of plaintiff's amended complaint pursuant to 28 U.S.C. § 1915. Plaintiff's original complaint arose out of his incarceration at the Federal Correctional Center in Butner, North Carolina. Plaintiff's amended complaint sought to allege <u>Bivens</u> claims against Mor[in], Tucker-Hill, Barrett, Brawner, Gregory, Mercado, Beeler, Adcocks, Cox, Tilley, and Lappin, as well as defendants Official Elwood ("Elwood"), John Doe Pharmacist ("Pharmacist"), and Contract Compliance Official Stancil ("Stancil"). Plaintiff's amended complaint also sought to add new claims arising out of his incarceration at Rivers Correctional Institution ("Rivers"), against new defendants the GEO Group, Inc. ("GEO Group"), Jonathan Miner ("Miner"), George Snyder ("Snyder"), David Farmer ("Farmer"), Chaplain Blevins ("Blevins"), and Dr. Larabee ("Larabee").

> The court severed all of plaintiff's claims arising out of events that occurred at Rivers against GEO Group, Miner, Snyder, Farmer, Blevins, and Larabee. The court also dismissed as frivolous plaintiff's claims regarding his legal mail and mail to government agencies. Finally, the court dismissed as frivolous plaintiff's claim of negligent deprivation of property and his claim pursuant to the Vienna Convention. After the court's frivolity review, plaintiff's following claims remain: (1) deliberate indifference to his medical needs in violation of the Eighth Amendment to the United States

2

Constitution; (2) violation of the Eighth Amendment/Due Process Clause of the Fifth Amendment to the United States Constitution arising out of his solitary confinement; (3) retaliation in violation of the First Amendment to the United States Constitution; (4) enactment of prison policies by Lappin that violated his constitutional rights; (5) violation of 42 U.S.C. § 1997d; (6) violation of the Fifth Amendment of the United States Constitution by Tilley in the course of his disciplinary hearing; and (7) denial of access to the [Federal Bureau of Prisons ("BOP")]BOP's grievance process. Plaintiff subsequently filed a motion to require prison officials to treat mail from this court as legal mail.

On November 16, 2011, defendants filed a motion to stay the court's scheduling order and a motion for summary judgment, arguing that plaintiff's claim should be dismissed because he failed to exhaust his administrative remedies and because plaintiff failed to state a claim upon which relief may be granted. Alternatively, defendants assert the defense of qualified immunity. Plaintiff then filed a motion for reconsideration of the court's October 20, 2011 order, a motion requesting that service of process be made on defendants Elwood and Stancil, a motion for a continuance to complete discovery, a motion to strike, and a response to defendants' motion for summary judgment. Defendants then filed a reply as well as a motion for a protective order.

On September 25, 2012, the court entered an order granting in part and denying in part defendants' motion for summary judgment. The motion was granted as to the following claims of plaintiff: (1) his claim alleging discrimination; (2) his claim pursuant to 42 U.S.C. § 1997d; (3) his claim pursuant to the Administrative Procedures Act; (4) his claim regarding access to the grievance process; and (5) his claims against Beeler and Lappin. The court denied defendants' motion to dismiss as to plaintiff's remaining claims. The court also granted defendants' motion to stay the initial order and motion for a protective order. As for plaintiff's motions, the court granted in part and denied in part plaintiff's motion requesting that service of process be made on defendants

Elwood and Stancil. As a result, the court dismissed without prejudice plaintiff's action against Stancil. The court denied plaintiff's remaining motions.

On December 3, 2012, Adcocks, Barrett, Brawner, Cox, Elwood, Gregory, Mercado, Morin, Tilley, and Tucker-Hill filed a motion for summary judgment, arguing that plaintiff failed to establish a constitutional violation. Alternatively, defendants assert the affirmative defense of qualified immunity. The issues were fully briefed.

On May 16, 2013, the court entered an order, inter alia, dismissing the John Doe Pharmacist from this action pursuant to Federal Rule of Civil Procedure 4(m). The court also directed defendants to file supplemental evidence and a reply to their motion for summary judgment. The court held defendants' motion for summary judgment in abeyance.

Plaintiff subsequently filed a motion to reinstate the John Doe Pharmacist and a motion to stay the proceedings, which the court denied. Defendants also complied with the court's order and provided both supplemental evidence and a reply brief. Plaintiff filed a response.

## STATEMENT OF FACTS

Plaintiff was incarcerated at the Low Security Correctional Institution in Butner, North Carolina ("LSCI-Butner") from January 24, 2008, through May 2, 2008, and from July 2, 2008, through September 8, 2008.[3] Mercado Aff. ¶ 6. On December 4, 2007, the Special Investigative Services ("SIS") office received information stating that an unauthorized cellular telephone was inside LSCI-Butner. Tucker-Hill Aff. ¶ 7. The next day, correctional staff searched LSCI-Butner and located the cellular telephone. Id. Plaintiff, as well as, several other inmates were suspected

---

[3] The court notes that plaintiff was confined at the Federal Correctional Institution Butner II ("FCI II Butner") from May 2, 2008, through July 2, 2008. Mercado Aff. ¶ 6.

4

of being involved in possessing/introducing the cellular telephone into the institution.  Id.  and Attach. 1.

On December 12, 2007, a BOP lieutenant ordered that plaintiff be placed into administrative detention pending the SIS investigation into the cellular telephone incident.  Id. ¶ 8.  Plaintiff's detention additionally was based upon the lieutenant's determination that plaintiff's continued presence in the general population posed a serious threat to life, property, self, staff, other inmates, or to the security or orderly running of the institution because of the circumstances of the investigation.  Id.  and Attach. 2 (administrative detention order).

Due to the SIS investigation, Tucker-Hill ordered that plaintiff's general correspondence mail be inspected by the SIS office for potential contraband and evidence of prohibited or unlawful activity in accordance with BOP regulations.  Id. ¶ 9.  Tucker-Hill did not request that plaintiff's special mail be routed to the SIS office for inspection.  Id.  Tucker-Hill also recommended that plaintiff be removed from his special housing unit ("SHU") orderly job while he was under investigation.  Id. ¶ 16.

In April 2008, BOP officials received information implicating plaintiff, as well as other LSCI-Butner inmates and LSCI-Butner staff in unlawful conduct, including the introduction of contraband (tobacco) into the institution and bribery of an official.  Id. ¶ 11.  Prison officials then forwarded the information to the Federal Bureau of Investigation ("FBI") for further investigation. Id.

On April 8, 2008, plaintiff was issued an incident report for possession of a hazardous tool (a cellular telephone) and giving/receiving money from any person for illegal contraband.  Tucker-Hill Aff. ¶ 12, and Attach. 1.  At his June 12, 2008, disciplinary hearing, plaintiff admitted that he

5

possessed a cellular telephone. Id. ¶ 13 and Attach. 1. The Disciplinary Hearing Officer then found plaintiff guilty of the possessing a hazardous tool charge and sanctioned him to the disallowance of forty (40) days of good conduct time credit and a one year loss of telephone privileges. Id. Plaintiff remained in administrative detention at LSCI-Butner, due to the pending federal investigation, until September 2008, when he was transferred from LSCI-Butner to another facility. Id. ¶ 14. At the conclusion of the FBI's investigation, plaintiff was convicted in the United States District Court for the Eastern District of North Carolina of conspiracy to bribe a public official and acceptance of a bribe by a public official in violation of 18 U.S.C. § 371. United States v. Patel, No. 5:09-CR-4-6BR (E.D.N.C. Jan. 12, 2010). In January 2010, plaintiff was sentenced to an eight month term of imprisonment. Id.

The relevant facts pertaining to plaintiff's medical care while at LSCI-Butner are as follows. Upon plaintiff's transfer from FCI II-Butner to LSCI-Butner on January 24, 2008, a medical transfer note stated that plaintiff was briefly confined at the SHU at FCI II-Butner. Mercado Supp. Aff. ¶ 7. The note further stated that FCI II-Butner medical staff had seen plaintiff that day and ordered an electrocardiogram ("EKG"). Id. Finally, the note stated that plaintiff had no medical intervention while at the FCI II-Butner SHU, and that plaintiff's condition was stable at the time of his transfer to LSCI-Butner. Id. Plaintiff, at that time, maintained a "care level" 2 status, with regular duty and no special needs noted. Id. and Attach 1, pp. 33-34. Upon arriving at LSCI-Butner, plaintiff was placed in the SHU, and no complaints were noted. Id. ¶ 8, and Attach. 1, p. 35.

On January 25, 2008, LSCI-Butner medical staff requested both medications and an EKG for plaintiff. Id. ¶ 9 and Attach. p. 32. A few days later, plaintiff requested an injection for his ankle

6

and medical staff notified him that he had an appointment in the near future.  Id. ¶ 10, and Attach.

p. 74.

On February 13, 2008, Mercado first saw plaintiff for a chronic care clinic appointment.  Id.

¶ 13 and Attach. p. 17.  At that visit, plaintiff complained that he was suffering neck pain as a result

of having possibly twisted his neck.  Id.  Plaintiff also reported that he was experiencing ankle and

foot pain at a site where he had a prior surgery.  Id.  After examining plaintiff, Mercado prescribed

plaintiff various medications, including a pain medication for his neck and Metoprolol for his

hypertension.  Id.  Mercado also noted that plaintiff was pending an orthopedic follow-up for a

steroid injection for his ankle.  Id.  Finally, Mercado ordered laboratory testing as well as a cervical

spine series of electromagnetic radiation (x-ray) testing.  Id.

On February 21, 2008, Mercado noted that plaintiff had undergone cervical spine surgery

prior to his arrival at Butner.  Id. ¶ 14 and Attach. p. 27.  Mercado reviewed the October 2007 post-

operative note and noted that he "did not find any recommendations for subsequent F/U [follow

up]."[4]  Id.  Mercado made the decision to keep plaintiff's treatment status quo.  Id.

On March 10, 2008, medical staff saw plaintiff at a chronic care clinic/sick call visit in the

SHU in response to plaintiff's complaint about medical issues.  Id. ¶ 19 Attach. 1, pp 22-23.  It was

noted that plaintiff underwent surgery on October 22, 2007, for an anterior cervical discectomy and

fusion and had a post-operative diagnosis of herniated nucleus pulposus.  Id.  Plaintiff submitted a

sick call request that same day, complaining about medical issues pertaining to physical therapy,

---

[4]  The court notes that Mercado also stated that "[h]aving again reviewed the October
2007 post-operative note for purposes of this litigation, [plaintiff's] surgeon recommended
[plaintiff] follow-up in 2-3 weeks from the date of the note."  Id. ¶ 14. Mercado stated that based
upon the language in the note, he would have expected plaintiff to have already attended the
follow-up appointment prior to plaintiff's January 24, 2008, arrival at LSCI-Butner.  Id.

7

urinary frequency, left ankle pain, and numbness and tingling on his right side.  Id.  In response, medical staff informed plaintiff that they were waiting for instruction from the physical therapist regarding plaintiff's physical therapy treatment.  Id.  A follow-up for a left ankle steroid injection was noted as pending.  Id.  A urology consult for follow-up was noted, as well as, a follow-up examination in the SHU for March 11, 2008.  Id.

On March 11, 2008, medical staff examined plaintiff in the SHU.  Id. ¶ 20 and Attach. 1 p. 23, 20.  Plaintiff complained of left arm atrophy and requested physical therapy.  Id.  Plaintiff also requested soft shoes and an extra pillow pass, stating that he did not have a pillow.  Id.  Medical staff noted a plan to schedule plaintiff for a physical therapy consultation and to assess him for shoe qualification.  Id.  Medical staff also entered a request for an orthopedic consultation for a steroid injection.  Id.  On March 18, 2008, medical staff informed plaintiff that his request for an ankle steroid injection had already been submitted.  Id. ¶ 23 and Attach. 1, p. 20.  Plaintiff's medical records also reflect that he refused prescribed laboratory testing on March 25, 2008.  Id. ¶ 24 and Attach. 1, p. 62.  However, plaintiff did submit to an urinalysis test on March 28, 2008.  Id. ¶ 26 and Attach. 1, p. 36.

On April 2, 2008, physical therapy staff examined plaintiff, and provided him therapeutic exercises to perform and issued him a green exercise band.  Id. ¶ 27 and Attach. 1, p. 78.  On that same date, a large "bag of medicine" arrived for plaintiff and was dispensed that morning.  Id. ¶ 28 and Attach. 1, p. 19.  Two days later, plaintiff informed medical staff that he did not receive his blood pressure medication (Metoprolol).  Id. ¶ 30 and Attach. 1, p. 19.  Plaintiff was instructed to write a sick call slip to inform medical staff as to the name of the missing medication.  Id.  Plaintiff

8

complied with the instruction to submit a sick call request, and his missing medication was ordered on April 11, 2008. Id. ¶ 31-32 and Attach. 1 p. 17, 54.

On April 14, 2008, plaintiff requested a follow-up appointment with Dr. Price, his spinal surgeon. Id. ¶ 35 and Attach. 1, pp. 17-18. In response, a physician's assistant examined plaintiff and made a note to discuss plaintiff's request with Mercado. Id. The clinical director of the Federal Correctional Center in Butner, North Carolina ("FCC-Butner") then informed plaintiff that he was pending an orthopedic appointment for his surgery follow-up and that, during the appointment, a determination would be made as to whether he needed an appointment with Dr. Price. Id. ¶ 36 and Attach. 1, pp. 78-80. The clinical director also informed plaintiff that his most recent medical chart did not reveal that he had a current pass for an extra pillow, but that he would be evaluated for one. Id. Plaintiff further was advised that after his April 2, 2008, appointment with the physical therapist, the physical therapist advised plaintiff of the many therapeutic activities that he could perform independently. Id. The physical therapist also issued plaintiff a green exercise band and recommended that plaintiff receive a pillow for optimal cervical positioning. Id. The therapist advised that no further treatment was necessary. Id.

On April 18, 2008, plaintiff received a cervical spine series examination at Butner. Id. ¶ 39 and Attach. 1, p. 67. The purpose of the testing was to check plaintiff's status post his October 2007, cervical spine surgery in light of residual numbness in the median nerve distribution. Id. The radiologic report was reviewed by Dr. Hall, an orthopedic surgeon. Id.

On April 21, 2008, plaintiff was given a medical duty status assignment of "soft shoes only" and "no lifting over 15 LBS." Id. ¶ 42 and Attach. 1, p. 70. Plaintiff also was assigned a medical care level 3, indicating complex chronic care. Id.

9

On April 30, 2008, plaintiff was transferred from LSCI-Butner to FCI II-Butner.  Id. ¶ 45 and Attach. 1, pp. 12, 63.  Plaintiff was medically screened in the chronic care clinic, and listed as a care level 2 status.  Id. ¶ 46.

On May 15, 2008, plaintiff attended an appointment with an orthopedic physician.  Id. ¶ 49 and Attach. 1, p. 11.  The Utilization Review Committee subsequently approved plaintiff for a medical consultation for follow-up of his status/post anterior cervical fusion and discectomy surgery (in October 2007). Id. ¶ 50 and Attach. 1, p. 93.

Plaintiff then attended his follow-up with Dr. Price on June 6, 2008.  Id. ¶ 51 and Attach. 1, pp. 65-66.  Dr. Price noted that from the standpoint of his cervical spine surgery, plaintiff was doing well and could complete fusion for his upper extremity numbness.  Id.  Dr. Price further noted that, most likely, plaintiff had an ulnar entrapment at the elbow.  Id.  Dr. Price stated, if plaintiff's condition was bad enough, plaintiff could consider getting an electromyography ("EMG") and nerve conduction studies of the upper extremities to see if there is ulnar entrapment.  Id.  Finally, Dr. Price stated that plaintiff was discharged with no further restrictions.  Id.  Plaintiff subsequently attended a neurosurgeon consultation on June 13, 2008.  Id. ¶ 52 and Attach. 1, p. 11.  Plaintiff did not attend his June 19, 2008, orthopedic appointment, but the appointment was re-scheduled.  Id. ¶ 53 and Attach. 1, p. 64.

On June 26, 2008, plaintiff attended an appointment with medical staff in response to his complaints of a headache and pain in his neck and shoulder.  Id. ¶ 55 and Attach. p. 11.  Plaintiff also stated that he was not receiving his anti-convulsion medication at night.  Id.  Staff advised plaintiff to talk with medical staff about getting medication passes to ensure that he has access to his medication.  Id.

On July 2, 2008, plaintiff was transferred back to LSCI-Butner. Id. ¶ 57 and Attach. 1, pp. 7-9; Attach. 2, p. 112. Plaintiff's condition was stable and he was a care level 2. Id. ¶ 57.

On July 29, 2008, plaintiff informed staff that he had not been seen at the chronic care clinic in over three months. Id. ¶ 61 and Attach 2, p. 111. In response, medical staff instructed plaintiff that as a care level 2 inmate, he was scheduled to be seen every four to six months or as clinically indicated. Id. Staff also noted that laboratory testing would be ordered in anticipation of plaintiff's future chronic care appointment. Id.

On July 23, July 29, July 31, and August 2, 2008, plaintiff requested replacement physical therapy bands because his were taken when he was moved to the FCI II-Butner SHU on May 2, 2008. Id. ¶ 60 and Attach. 2, pp. 150-152. Plaintiff's medical records reflect that staff investigated the issue and made inquiries with the physical therapy department. Id. Attach. 2 pp. 150-153. In response to plaintiff's August 8, 2008, request for physical therapy bands, prison staff responded that he should have received them on August 12, 2008. Id. Attach. 2, p. 147.

On August 6, 2008, medical staff examined plaintiff in response to his complaints of shoulder pain and foot numbness. Id. ¶ 65 and Attach. 1, p. 5. Plaintiff agreed with medical staff that his condition was not acute and that further evaluation could wait until his chronic care appointment in four to six weeks. Id. Attach. 2, p. 109. Plaintiff subsequently failed to attend his August 7, 2008, orthopedic appointment due to a "separatee" issue. Id. ¶ 66 and Attach. 2, p. 143. The appointment was scheduled for one month later. Id.

On September 3, 2008, Mercado examined plaintiff during a chronic care visit at which plaintiff complained of shoulder pain, tingling in his arms, weakness in his left wrist, pain in a patch of skin on his chest, trouble breathing, headaches, high blood pressure, and numbness in his ankle

11

and toe. Id. ¶ 72 and Attach. 2, pp. 98-103. Mercado noted plaintiff's chronic medical conditions

of unspecified essential hypertension, mixed hyperlipidemia, shoulder pain, hypertonicity of bladder,

and reflux esophagitis, as well as a history of intervertebral disc problem with myelopathy in the

cervical region. Id. Mercado prescribed plaintiff medication for his blood pressure, counseled him

as to his plan of care, and recommended that plaintiff follow-up in three months and use sick call

as needed. Id. Plaintiff was transferred to another facility on September 8, 2008. Id. ¶ 73.

## DISCUSSION

A.      Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v.

Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden

of initially coming forward and demonstrating an absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the

nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material

fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party

for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

B.      Analysis

Defendants raise the defense of qualified immunity against plaintiff's Bivens action.

Government officials are entitled to qualified immunity from civil damages so long as "their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known."    Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, a

12

government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

1.      Interference with General Mail

Plaintiff alleges that Gregory, Tucker-Hill, Brawner, Barrett, and Elwood interfered with his general mail in violation of the First Amendment to the United States Constitution. In support of his claim, plaintiff alleges that all of his mail was required to be sent to the SIS unit where it was opened, inspected, censored, stolen, or delivered to plaintiff in an untimely manner. Plaintiff alleges that he was not notified of any of the alleged "seizures" of his mail. Plaintiff states that institutional mail, including grievance responses, were seized. Plaintiff states that he was not on any restrictive mail status during this time period. Plaintiff further states that "dozens of mail and hundreds of periodicals [] magically resurface[d]" after he filed this action. Compl. p. 8.

Prisoners have a First Amendment right to send and receive mail. See Thornburgh v. Abbott, 490 U.S. 401, 407 (1989). However, prison officials may adopt regulations that impinge on a prisoner's constitutional rights if those regulations are "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). The Fourth Circuit, in Altizer v. Deeds, 191 F.3d 540, 547-48 (4th Cir. 1999), held "the opening and inspecting of an inmate's outgoing mail is reasonably related to legitimate penological interests, and, therefore, constitutional . . . ." See Busby v. Dretke, 359 F.3d 708, 721 (5th Cir. 2004) (recognizing that prison officials are permitted to open and read all of an inmate's non-privileged general correspondence due to the legitimate penological concerns regarding security, order, and rehabilitation). Moreover, in noting the delicate nature of

prison management, the Supreme Court has "afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." Thornburgh, 490 U.S. at 408 (citation omitted).

Here, the record reflects that plaintiff's general mail was screened in response to an investigation for smuggling a prohibited cellular telephone into LSCI-Butner. Tucker-Hill submitted an affidavit stating that he had mailroom staff send plaintiff's general correspondence mail to the SIS office for SIS staff to inspect the mail for potential contraband or unlawful activity in accordance with regulations. Tucker-Hill Aff. ¶¶ 9-10. Plaintiff fails to establish that defendants had any malicious intent to keep plaintiff from communicating with the public, and his conclusory allegations to the contrary are not sufficient to state a constitutional claim. Couch v. Jabe, No. 7:11-cv-34, 2012 WL 3043105, at *8 (W.D. Va. July 25, 2012).

To the extent plaintiff claims that defendants violated applicable BOP policies in the treatment of his mail, a violation of prison regulations, without more, does not give rise to a federal constitutional issue. Myers v. Klevenhagen, 97 F.3d 91, 94 (5th Cir. Oct. 11, 1996); Jackson v. Dillman, No. 7:11CV140, 2011 WL 1882400, at *3 (W.D. Va. May 17, 2011) ("[T]he mere fact that the handling of [plaintiff's] mail and the resultant delay violated prison policies does not prove that the delay was intentional, and a negligent mail delay does not give rise to any constitutional claim of denial of access.") Thus, defendants are entitled to qualified immunity for this claim.

Plaintiff's claim that he was temporarily denied access to certain publications fails for similar reasons. As previously stated, a prison regulation which restricts an inmate's access to publications is constitutionally valid if it is reasonably related to a legitimate penological interests. Ward v. Washenaw County Sheriff's Department, 881 F.2d 325, 328-330 (6th Cir. 1989); see Thornburgh,

490 U.S. at 413 (citing <u>Turner</u>, 482 U.S. at 89). Here, plaintiff's temporary ban on receiving publications was a result of the fact that plaintiff was under investigation for smuggling a prohibited cellular telephone into LSCI-Butner and for conspiracy to bribe a public official/accepting a bribe from a public official. The court finds that this temporary ban on receiving publications was rationally related to the legitimate and neutral government objective of maintaining order at Butner. <u>See</u> <u>Kennedy v. Blankenship</u>, 100 F.3d 640, 642 n.2 (8th Cir. 1996) (holding that placement in punitive isolation was not atypical and significant deprivation even though prisoner faced restrictions in mail, telephone, visitation, commissary, and personal-possession privileges); <u>Little v. Norris</u>, 787 F.2d 1241, 1243 (8th Cir. 1986) ("The purpose of withholding personal mail is to make punitive isolation unpleasant, and thereby discourage improper behavior and promote security within the prison. Because the disciplinary sanction serves a valid purpose, and because thirty days is not an excessive length of time . . . we do not believe the sanction is unconstitutional."); <u>Rivera v. Byars</u>, No. 8L12-CV-2469, 2013 WL 3894843, at *6-7 (D.S.C. July 25, 2013) (finding no constitutional violation where prison withheld certain allegedly political publications and restricted what plaintiff may mail out). Moreover, plaintiff admits that he eventually received the publications in question, and has not shown that such a limited and temporary period of access to certain publications amounts to a First Amendment violation. For the foregoing reasons, the court finds that defendants are entitled to qualified immunity for this claim.

To the extent plaintiff alleges that certain items of mail were lost, confiscated or stolen by prison officials, a prisoner may not bring a federal claim for deprivation of property through the "random and unauthorized" acts of government officers, whether negligent or intentional, when state law provides an adequate remedy. To state a procedural or substantive due process claim, an inmate

15

must demonstrate that he was deprived of life, liberty, or property by government action.  Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997).

Beginning with plaintiff's procedural due process claim, he is not entitled to relief because even "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the [Fifth] Amendment if a meaningful post[-]deprivation remedy for the loss is available."  Hudson v. Palmer, 468 U.S. 517, 533 (1984) (holding that intentional deprivations of property by State employees do not violate due process until and unless the State refuses to provide a suitable post-deprivation remedy); see Mora v. City of Gaithersburg, 519 F.3d 216, 230-31 (4th Cir. 2008).  Here, an adequate post-deprivation remedy is available to plaintiff in state court.  See e.g., Wilkins v. Whitaker, 714 F.2d 4, 6-7 (4th Cir. 1983).  Because plaintiff has an adequate post-deprivation remedy in state court, his procedural due process claim fails.

As for substantive due process, the Fourth Circuit defines it as "an absolute check on certain governmental actions notwithstanding the fairness of the procedures used to implement those actions."  Front Royal and Warren County Industrial Park Corp. v. Town of Front Royal, Virginia, 135 F.3d 275, 287-88 (4th Cir. 1998) (internal quotation omitted).  The substantive due process check "is warranted only where no process could cure the deficiencies in the governmental action . . . In other words, governmental action offends substantive due process only where the resulting deprivation of life, liberty, or property is so unjust that no amount of fair procedure can rectify it."  Id.  In this case, the court does not find the alleged deprivation so unjust as to be incapable of avoidance by any procedural protections.  Moreover, post-deprivation state remedies are available to plaintiff.  Thus, plaintiff has not established a substantive due process violation. Calhoun-El v.

16

Maynard, No. RDB-07-220, 2007 WL 5254010, at *n.9 (D. Md. Nov. 19, 2007) (citing Pink v. Lester, 52 F.3d 73 (4th Cir. 1995)), aff'd, 267 F. App'x 252 (4th Cir. Feb. 27, 2008); Bowler v. Young, No. 7:03-CV-394, 2003 WL 24253707, at *1 (W.D. Va. June 25, 2003), aff'd, 78 F. App'x 281 (4th Cir. 2003). Because plaintiff fails to state a due process claim, defendants are entitled to qualified immunity.

2.      Interference with Legal Mail

The court addressed plaintiff's legal mail claims in its October 20, 2011, frivolity review of plaintiff's amended complaint. Plaintiff, in his response to defendants' supplemental filing, attempts to re-raise his legal mail claims. In particular, plaintiff states that his incoming legal mail was opened outside of his presence, and that its delivery was delayed for "weeks or months." Am. Compl. ¶ 32. Plaintiff specifically identifies five articles of legal mail from his attorneys which were opened outside of his presence. Id. ¶ 33. As stated in this court's October 20, 2011, order, plaintiff has failed to allege an injury for the alleged mishandling of his legal mail. See Lewis v. Casey, 518 U.S. 343, 351-52 (1996) (stating that in order to state a claim for denial of access to courts, an inmate must show actual injury or that a defendant's conduct hindered his efforts to pursue a legal claim). Moreover, isolated incidents of mail mishandling do not rise to the level of a constitutional violation. See Buie v. Jones, 717 F.2d 925, 926 (4th Cir. 1983) (finding isolated incidents of opening of legal mail does not state a congnizable § 1983 claim). Thus, the court finds this claim meritless.

Plaintiff additionally alleges that defendants violated his constitutional rights because they opened his legal mail outside of his presence. In support of this claim, plaintiff submitted a grievance response which acknowledged that a piece of legal mail was not treated in accordance

with BOP policy. Compl. Ex. 1. The grievance response, however, stated that the letter sent to plaintiff from his attorney did not comply with BOP policy because it was not appropriately marked as "special mail."[5] Id. Such mail may be opened outside of the inmate's presence. See United States v. Scott, 925 F.2d 83, 88-90 (4th Cir. 1991); see also, Hudson v. Palmer, 468 U.S. 517, 526 (1984); Perry v. Williams, No. 4:13-475-RMG-TER, 2013 WL 1703745, at *4 (D.S.C. Mar. 28, 2013) ("To be classified as legal mail, the legal sender must be specifically identified as the mail must be marked confidential. If such mail is not so marked, it may be opened outside an inmate's presence.")

Plaintiff additionally submitted numerous items of legal mail which he contends prison staff opened outside of his presence. See (DE 47). However, only three of the letters are marked by prison staff as opened outside of plaintiff's presence, which is not sufficient to establish a constitutional violation. See id. pp. 12, 18, 20; see Buie, 717 F.2d at 926. Plaintiff further presented evidence that prison staff worked with plaintiff to resolve the issues with his legal mail. See id. p. 50. Further, to the extent plaintiff presented evidence that there was a delay in his receipt of legal mail, the evidence reflects that the delay was due, in part, to his transfer from FCI I-Butner to LSCI-Butner. id. p. 44. Plaintiff has not presented any evidence, aside from his conclusory allegations, to demonstrate that prison officials intentionally interfered with his legal mail. Moreover, plaintiff has raised similar mail-related claims that were rejected by the United States District Court for the Northern District of Texas. See Patel v. Thompson, No. 1:05-CV-225-BI ECF, 2010 WL 3633759, at *14-15 (N.D. Tex. Sept. 16, 2010), aff'd, 470 F. App'x 240 (5th Cir. Mar. 28, 2012). Based upon

---

[5] Plaintiff also submitted a letter from his attorney stating that plaintiff did not receive one of his attorney's letters, but acknowledging the fact that it was not appropriately marked. Compl. Ex. 1.

the foregoing, plaintiff has not established a constitutional violation and defendants are entitled to qualified immunity for these claims.

      3.     Retaliation Claim

Plaintiff alleges that Morin, the complex captain at LSCI-Butner, and Tucker-Hill terminated him from his prison orderly job in retaliation for exercising his First Amendment right to access to courts. In support of his claim, plaintiff states that on July 10, 2008, plaintiff filed a civil complaint naming Tucker-Hill as a defendant. Plaintiff further states that Tucker-Hill discovered the civil complaint in the course of monitoring plaintiff's incoming and outgoing legal mail, and that when Tucker-Hill discovered the civil complaint, he instructed Lieutenant Allen to fire him from his SHU orderly position on July 14, 2010. Compl. p. 14.

Claims of retaliation in the prison context are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994). To prevail on a claim of retaliation, plaintiff must demonstrate "either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Id. at 75. "In addition, plaintiff must come forward with specific evidence 'establish[ing] that but for the retaliatory motive the complained of incident[s] . . . would not have occurred.' " Scott v. Kelly, 107 F. Supp.2d 706, 709 (E.D. Va. 2000) (quoting Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995)), aff'd, 6 F. App'x 187 (4th Cir. Mar. 28, 2001). Mere, "temporal proximity" between the inmate's protected activity and the official's allegedly retaliatory act "is simply too slender a reed on which to rest" a retaliation claim. Wagner v. Wheller, 13 F.3d 86, 90-91 (4th Cir. 1993) (requiring plaintiff to show "a causal relationship between the protected expression and the retaliatory action").

Here, the record reflects that plaintiff was convicted of the disciplinary offenses of possession of a hazardous tool on June 12, 2008. Tucker-Hill Aff. ¶ 13. During this time period, plaintiff also was the subject of an FBI investigation which lead to his federal conviction for conspiracy to bribe a public official and acceptance of a bribe by a public official. Id. Due to the disciplinary conviction and FBI investigation, Tucker-Hill recommended that plaintiff be terminated from his orderly position on July 14, 2010, for security reasons because it allowed plaintiff greater freedom of movement and contact with inmates and staff in the SHU. Id. ¶ 16.

The temporal proximity of the disciplinary conviction, the FBI investigation, the filing of the civil action against Tucker-Hill, and the termination from the SHU orderly position appear to be coincidental. Moreover, the fact that plaintiff's SHU orderly replacement, inmate Lawrence Woodard, was convicted of smuggling a firearm into LSCI-Butner does not prove a retaliatory motive, especially due to the fact that the inmates were not involved in the same incident and the fact that plaintiff was involved in more than one incident. Plaintiff has not presented any evidence to establish that Tucker-Hill or Morin terminated him from his orderly position in retaliation for filing a law suit. See, e.g., Dougherty v. Virginia, No. 7:12CV549, 2013 WL 750140, at *6 (W.D. Va. Feb. 27, 2013) (stating that plaintiff's retaliation claim "rests on nothing more than a conclusory assertion that since officials took adverse actions against him after he filed his lawsuits in circuit court, they must have done so to retaliate against him for exercising his right to access the court. The mere timing of these events does not satisfy the necessary causation element of a § 1983 retaliation claim"). Thus, plaintiff has not established a constitutional violation, and Tucker-Hill and Morin are entitled to qualified immunity for this claim.[6]

---

[6] The court notes that plaintiff's loss of his prison job is not actionable given that inmates do not have a right to a prison job. See O'Bar v. Pinion, 953 F.2d 74, 82-84 (4th Cir.

4.    Placement in Segregation

Plaintiff alleges that Tucker-Hill, Barrett, Brawner, and Elwood violated his rights pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution when they assigned him to the SHU for an indefinite period of time pending an investigation. As stated, to prevail on either a procedural or substantive due process claim, an inmate first must demonstrate that he was deprived of "life, liberty or property" by governmental action. See Plyler v. Moore, 100 F.3d 365, 374 (4th Cir. 1996). Generally, confinement in segregation does not exceed the sentence imposed in such an extreme way as to give rise to the protection of the Due Process Clause by its own force. See United States v. Daniels, 222 F. App'x 341, 342 n.* (4th Cir. Mar. 30, 2007); Williams v. Johnson, No. 7:10-CV-377, 2010 WL 3395700, at *2 (W.D.Va. Aug. 26, 2010) ("An inmate does not have a constitutional right to be placed in a specific security classification or facility, and custodial classifications do not create a major disruption in a prisoner's environment.")

Pursuant to BOP policy, an inmate may be placed into administrative detention for various reasons, including when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution and when the inmate is pending an investigation of a violation of BOP regulations. 28 C.F.R. § 541.23(c). BOP policy further generally requires the completion of an administrative detention order detailing the reasons for placing an inmate in administrative detention. Id. § 541.25.

In the case at hand, the record reflects that plaintiff initially was placed on administrative detention on December 12, 2007, based on a pending SIS investigation and a lieutenant's determination that plaintiff's continued presence in the general population posed a serious threat to

---

1991).

life, property, self, staff, other inmates or to the security or orderly running of the institution because of the circumstances of the investigation. Id. ¶ 8; Tucker-Hill Aff. Attach. 2 (administrative detention order). Plaintiff's administrative detention status continued because he was the subject of a FBI bribery investigation. Plaintiff was notified regarding the reason for his placement in the SHU. Tucker-Hill Aff., Attach. 2. This conduct complies with BOP regulations which permits the placement of inmates in the SHU "pending investigation or awaiting a hearing for possibly violating a Bureau regulation or criminal law." 28 C.F.R. § 541.23 (c)(1). Plaintiff, additionally, has not established conditions of confinement which were atypical as compared to ordinary prison life. See, e.g., Beverati, 120 F.3d at 504 (holding that where inmates were kept in solitary confinement for six months, and that the cells were unsanitary, vermin-infested, flooded from the toilets on the floor above, kept at very high temperatures, and they received cold food in small portions, only infrequently received clean clothes and linens, and were not allowed to participate in exercise, education, or religious activities at the prison, these conditions "were not so atypical that exposure to them for six months imposed a significant hardship in relation to the ordinary incidents of prison life"). Based upon the foregoing, the court finds that plaintiff's due process rights have not been violated, and that defendants are entitled to qualified immunity for this claim. See, e.g., Gray v. Jerrel, No. 7:05CV703, 2005 WL 3115956, at *2 (W.D. Va. Nov. 21,2 005) ("While being placed in administrative segregation pending an investigation of a grievance and being housed in a general population unit which is at times may be inconvenient and unfortunate, Gray has not alleged anything to suggest that these conditions violate contemporary standards of decency nor that he has suffered any injury related to those conditions").

5.    Disciplinary Hearing Challenge

Plaintiff argues that defendants violated his rights pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution when prison officials failed to provide him with a copy of his disciplinary hearing report for his possession of a hazardous tool disciplinary conviction. The Due Process Clause of the Fifth Amendment mandates several procedural safeguards before an inmate may be punished for violating prison disciplinary rules with the loss of protected liberty interest, such as earned good conduct time credit, or with deprivation of property. Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974). These limited due process rights include advanced, written notice of the charges, written findings, and a limited right to call witnesses. See id. at 563-64.

The record reflects that plaintiff had a disciplinary hearing on his possession of a hazardous tool charge on June 12, 2008, at which he was found guilty of the charge. Tucker-Hill Aff. ¶ 13. Plaintiff states that he did not receive the disciplinary hearing report until eight months following the disciplinary hearing, which prevented him from filing an appeal of his disciplinary conviction. In response, disciplinary hearing officer ("DHO") Tilley states that he was the only DHO at LSCI-Butner at the time of plaintiff's hearing, that there were several months of backlog of DHO reports to be written, that LSCI-Butner lacked sufficient resources to complete the reports in a more timely manner, and that plaintiff's DHO report had inadvertently been misplaced. Tilley Aff. ¶ ¶ 9, 12.[7] The record further reflects that plaintiff was not denied the opportunity to file an appeal. Id. Attach.

---

[7] Tilley admits that his DHO report was not completed within the ten (10) day time frame provided by former 28 C.F.R. § 541.17(g). The court notes that the regulations in effect during the relevant time period were amended in 2010 to remove this requirement. See 28 C.F.R. § 541.8(h).

2;[8] BOP Policies and Procedures Chpt. 8, § 5270.07. Plaintiff has not presented any evidence to the contrary. Because plaintiff is unable to establish prejudice, the court finds that his delay in receiving the report does not violate due process. See Queen v. Cross, No. 2:09-CV-95, 2010 WL 2196558, at *3 (N.D.W. Va. May 26, 2010), aff'd, 430 F. App'x 211 (4th Cir. May 23, 2011).

      6.     Medical Care

     Plaintiff alleges that Tucker-Hill and Mercado violated his Eighth Amendment rights because they were deliberately indifferent to his medical needs. "In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.' " Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting Williams v. Griffin, 952 F.2d 820, 824 (4th Cir. 1991)). The Supreme Court has explained that the first prong is an objective one–the prisoner must show that "the deprivation of [a] basic human need was objectively 'sufficiently serious' "–and the second prong is subjective–the prisoner must show that "subjectively 'the officials act[ed] with a sufficiently culpable state of mind.' " See Strickler, 989 F.2d at 1379 (quotations omitted).

     The court assumes, without deciding, that plaintiff is able to satisfy the objective prong of the Eighth Amendment test. Accordingly, the court focuses its inquiry on the second prong-whether defendants acted with deliberate indifference to his serious medical needs. "Deliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." See

---

    [8] The DHO report specifically states that plaintiff had twenty (20) days from the date he received the report to file an appeal. Tilley Aff. Attach. 2. Plaintiff has not presented evidence that he was prevented from filing an appeal.

<u>Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994). It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. <u>Id.</u> at 837; <u>Shakka v. Smith</u>, 71 F.3d 162, 166 (4th Cir. 1995). Mere negligence or malpractice in diagnosis or treatment does not state a constitutional claim. <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-106 (1976); <u>Johnson v. Quinones</u>, 145 F.3d 164, 168 (4th Cir. 1998).

Beginning with plaintiff's claim that Mercado and Tucker-Hill acted with deliberate indifference to his need for physical therapy, the record reflects that each time plaintiff complained about a physical therapy related issue, medical staff was responsive. Further, plaintiff concedes, and the record reflects, that he was prescribed a "course of conduct[,]" including green physical therapy bands, by the physical therapy staff. Pl.'s Resp. (DE 104), p. 3 and Ex. 2. While it appears that plaintiff's therapy bands were confiscated on May 2, 2008, when plaintiff was moved to the SHU, the prison staff were responsive to plaintiff's complaints regarding the missing physical therapy bands and provided him guidance on resolving the issue.[9] Mercado Supp. Aff. ¶ 60 and Attach. 2, pp. 147, 149-152. and Pl.'s Resp. (DE 104) Ex. 14. At most, the delay in procuring replacement physical therapy bands constitutes negligence, which is not actionable pursuant to § 1983. <u>See Estelle</u>, 429 U.S. at 105-106. Plaintiff has not presented any evidence to the contrary. Because there is no evidence in the record that Mercado or Tucker-Hill actually knew of and disregarded any objectively serious condition, medical need, or risk of harm, these defendants are entitled to summary judgment for this claim.

To the extent plaintiff asserts that Mercado and Tucker-Hill acted with deliberate indifference to his need for therapy pillows, the record again reflects that the LSCI-Butner medical

---

[9] It appears that plaintiff received his physical therapy bands on August 12, 2008. Mercado Supp. Aff. ¶ 66 and Attach. 2, p. 147.

staff considered and responded to plaintiff's requests. Mercado Supp. Aff. ¶¶ 20, 36, 37, 49. Moreover, there is no evidence that Mercado or Tucker-Hill actually knew of and disregarded his need for therapy pillows. Thus, plaintiff has not established a constitutional violation, and defendants are entitled to qualified immunity for this claim.

Plaintiff also asserts that he was denied his prescription for Metoprolol. The record, however, reflects that Mercado ordered Metoprolol for plaintiff. Id. ¶ 13. When plaintiff's medications arrived at LSCI-Butner, the Metoprolol was missing. Id. ¶ 30. Plaintiff then informed medical staff that the medication was missing, and medical staff obtained the medication for plaintiff. Id. ¶ 31-32. At most, the mistake involving plaintiff's Metoprolol medication constituted negligence, which is insufficient to state a constitutional claim. Estelle, 429 U.S. 105-106. Thus, defendants are entitled to summary judgment for this claim.

Regarding plaintiff's claim that Mercado and Tucker-Hill refused to allow plaintiff to attend his post-surgical follow-up appointment with Dr. Price, the record refutes plaintiff's claim. The October 2007 post-operative note stated that plaintiff was to attend a follow-up appointment two-three weeks after his surgery. Id. ¶ 14. Given this medical note, Mercado assumed that plaintiff attended his follow-up appointment with Dr. Price. Id. The record further reflects that plaintiff subsequently was referred to Dr. Price for evaluation and follow-up care. Plaintiff has presented no evidence to refute these records. Based upon the foregoing, the court finds that there is no evidence that Mercado or Tucker-Hill actually knew of and disregarded plaintiff's need for a follow-up appointment after plaintiff's October 2007 surgery. Thus, Mercado and Tucker-Hill are entitled to qualified immunity for this claim.

As for plaintiff's claim that Mercado and Tucker-Hill provided him with no medical care while he was in the SHU, prevented him from attending medical appointments, or prevented him from having surgery on his biceps tendon, these claims are belied by plaintiff's medical records. Nor is there any evidence that Mercado or Tucker-Hill intentionally interfered with a prescribed course of treatment. Plaintiff's medical records instead reflect that plaintiff received regular, consistent, and extensive medical care while housed at the LSCI-Butner. Farmer, 511 U.S. at 833-34 (finding that deliberate indifference requires that a prison officials knows of and disregards a substantial risk to an inmate's health); Ward v. Deboo, No. 1:11cv68, 2012 WL 2359440, at *13 (N.D.W. Va. Jan. 18, 2012), aff'd, 482 F. App'x 852 (4th Cir. Oct. 16, 2012) ("The medical records submitted by the defendant demonstrate that the plaintiff was provided regular, continuous and appropriate medical care under the circumstances, and that there has never been an intentional interference with a prescribed course of treatment. Accordingly, nothing the record shows that the plaintiff's knee condition was not timely or properly treated").

To the extent plaintiff asserts that medical staff refused to transport him to medical appointments, plaintiff's medical records reflect that plaintiff attended several medical appointments while at LSCI-Butner. For instance, plaintiff attended several chronic care clinic appointments, and attended appointments with specialists, including an orthopedic specialist. Mercado Supp. Aff. ¶¶ 13, 19, 39, 49, 53, 66, 72. Although plaintiff's medical records also reflect that plaintiff missed some medical appointments, he has presented no evidence to suggest that it was due to any deliberate intent on behalf of any medical staff. Rather, plaintiff's records reflect that plaintiff missed some appointments due to a separatee issue (security concern), and that his missed appointments were rescheduled. Id. ¶¶ 53, 66; Attach. 2, p. 143.

Plaintiff does not present any evidence to refute that he received the care reflected in his medical records or that he was denied medical treatment while in the SHU. Plaintiff further does not present any evidence to establish that Tucker-Hill interfered with his medical treatment. Nor does plaintiff refute the fact that he received medical treatment. Rather, plaintiff asserts that he was not provided "specialized treatment." Pl.'s Resp. (DE 104), p. 3. Plaintiff's insistence upon receiving care from a medical specialist, at most, amounts to nothing more than a disagreement over the proper course of treatment, which is not actionable pursuant to § 1983. See e.g., Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975). Moreover, the fact that defendants' treatment of plaintiff was not effective does not give rise to a constitutional violation. See e.g., id.; Starling v. United States, 664 F. Supp.2d 558, 569-70 (D.S.C. 2009). Finally, any disagreement between medical professionals on the appropriate course of treatment does not reflect deliberate indifference. See, e.g., United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011). Based upon the foregoing, the court finds that plaintiff fails to satisfy the subjective prong of the Eighth Amendment test, and is unable to establish a constitutional violation. Thus, defendants are entitled to qualified immunity.[10]

---

[10] In support of his Eighth Amendment claim, plaintiff presented medical reports reflecting treatment that occurred in 2011, which was subsequent to his transfer from LSCI-Butner, in an attempt to establish that defendants acted with deliberate indifference to his medical needs while he was at LSCI-Butner. Pl.'s Resp. (DE 104) Ex. 4. Plaintiff also submitted an inmate request, dated October 4, 2008 (which was subsequent to his transfer from LSCI-Butner on September 8, 2008), in which plaintiff stated that his spine and shoulder condition had deteriorated significantly in the previous two weeks. Id. Ex. 7. Staff recognized the severity of plaintiff's condition and recommended a transfer to a facility better equipped to handle plaintiff's medical issues. Id. Based upon this evidence, it appears that plaintiff's condition deteriorated subsequent to his transfer from LSCI-Butner, and that medical staff at Butner recognized the severity of his medical needs and acted to assist plaintiff in getting a transfer to a facility that could better assist him with his medical needs. Accordingly, there is no evidence of deliberate indifference. Further, there is no evidence that plaintiff's medical condition was caused by defendants' actions, especially in light of the fact that plaintiff received extensive medical care while incarcerated at LSCI-Butner.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment (DE 68) is GRANTED. The Clerk of Court is DIRECTED to substitute the proper names for Jaqueline Morin and Jason Tucker-Hill in the caption of this action. Finally, the Clerk of Court is DIRECTED to close this case.

SO ORDERED, this the 23rd day of September, 2013.

_____
LOUISE W. FLANAGAN
United States District Judge